NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRETT A. MEYERS, | HON. JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 04-5488 (JBS) |
| GE GROUP LIFE ASSURANCE COMPANY et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Marc A. Weinberg, Esq.
SAFFERN & WEINBERG
1874 East Marlton Pike, Suite 3
Cherry Hill, New Jersey 08003
     Attorney for Plaintiff

Heather J. Holloway, Esq.
RAWLE & HENDERSON, LLP
One South Penn Square
Philadelphia, Pennsylvania 19107
     Attorney for Defendant GE Group Life Assurance Company

**SIMANDLE,** District Judge:

This matter comes before the Court upon cross-motions for summary judgment by Plaintiff Brett A. Meyers and Defendant GE Group Life Assurance Company.  Plaintiff seeks payment of benefits from Defendant under Plaintiff's former employer's long term disability benefits plan.  About two months after starting his employment, Mr. Meyers suffered a type A aortic dissection and a devastating post-surgical stroke which left him disabled.

Defendant denied the claim because it found that Plaintiff's aortic vessel disease was a pre-existing condition for which he had received prior treatment after suffering a type B aortic dissection two-and-a-half years earlier.  Plaintiff alleges that Defendant's decision to deny benefits violates Section 1132(a) of the Employee Retirement Income Security Act and cannot withstand scrutiny because it was not reasonable.  For the reasons discussed herein, Defendant's motion for summary judgment will be granted and Plaintiff's cross-motion will be denied.

I.   **BACKGROUND**

    A.   **Introduction**

Beginning on August 19, 2002, Brett A. Meyers ("Plaintiff") was employed as a consultant at BusinessEdge Solutions, Inc. ("BusinessEdge").  (Administrative Record at 245.)  While Plaintiff was a full-time employee on "active" status, Plaintiff was covered by BusinessEdge's long term disability benefit plan. (Id. at 1-30, 245.)  BusinessEdge retained Defendant GE Financial to provide long term disability coverage through GE Group Life Assurance Company ("Defendant").  This coverage covered all employees of BusinessEdge (aside from fourteen hourly employees) for short term as well as long term disability coverage as long as the employee was a full-time employee on "active" status. (Id. at 77-83.)

### B.   **BusinessEdge's Long Term Disability Plan**

On May 1, 2002, BusinessEdge began offering coverage under Defendant's long term disability plan (the "Plan"). (Administrative Rec. at 77-83.)  The Plan, which was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), was both funded and administered by Defendant. (Id. at 27.)  As the administrator of the Plan, Defendant had the discretion to determine claims eligibility and interpret provisions of the Plan. (Id.) Specifically, Part 13 of the Plan stated that Defendant shall serve as the Plan's claims fiduciary and:

> [S]hall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the [Plan]...shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits. All findings, decisions and/or determinations of any type made by [Defendant] shall not be disturbed unless [Defendant] has acted in an arbitrary and capricious manner.

(Id.)

The Plan also contains language excluding coverage "for any period of disability which is caused by, contributed to by, or results from a pre-existing condition...." (Id. at 8.)  The Plan defines a "pre-existing condition" as:

A sickness or injury for which you, during the treatment free period[1]...before the effective date of your insurance under the policy:

1.   Received medical care, treatment or consultation, diagnosis or diagnostic tests; or

2.   Took any drugs, medicine or medication prescribed or recommended by a physician.

(Id. at 8.)

Coverage under the Plan was limited to BusinessEdge employees that the Plan referred to as "Active Full-time Employees." (Id. at 3.) Thus, coverage under the Plan terminates when an employee ceases to be an "Active Full-time Employee." (Id.) Part 12 of the Plan states that:

The long term disability insurance coverage for [the insured] will automatically cease on the earliest date shown below:

1.   On the date [the insured] is no longer an Active Full-time Employee in a class eligible for insurance;

2.   On the date your employment terminates. Cessation of active employment will be deemed termination of employment as an Active Full-time Employee,....

* * * *

4.   On whichever of the following dates is applicable:

* * * *

(b)   the date your leave of absence begins, except if you are on an approved leave of absence

---

[1]  The "treatment-free period is defined as the three months immediately preceding the employee's the date of insurance coverage. (Id. at 4.) Here, because Plaintiff's date of coverage was August 19, 2002, the treatment-free period ran from May 19 until August 18, 2002. (Id. at 316.)

                    granted in accordance with a State Family
                    Leave Law or the Federal Family and Medical
                    Leave Act (FMLA), [the insured's] coverage
                    will be deemed to continue....

(<u>Id</u>. at 24.)(emphasis added).

    C.    **The Events of October 2002**

    On October 24, 2002, while working in Connecticut, Plaintiff
suffered a type A aortic dissection and required emergent medical
treatment.[2]  As part of the treatment, Plaintiff underwent
surgery at Yale-New Haven Medical Center on October 25, 2002
during which Dr. Michael L. Dewar, M.D. repaired Plaintiff's type
A aortic dissection and performed an aortic valve replacement.
(Rec. at 517-21.)  One or two days after surgery, Plaintiff
suffered a postoperative cerebrovascular stroke from which he
became aphasic and developed right-side weakness and a right
facial droop.[3]  (<u>Id</u>. at 346-47, 531-33.)

    A CT Scan revealed cortical/subcortical hypodensity in the
posterior left temporal lobe consistent with a stroke.  According

_____

    [2] Under the Stanford classification system, a type A aortic dissection involves a
dissection in the ascending aorta and may include the aortic arch. (<u>Id</u>. at 221.)  A type A
dissection may also be referred to as an ascending dissection. (<u>Id</u>.)  A type B dissection is
restricted to dissections that occur in the descending aorta. Again, because of the placement of
the dissection, a type B dissection is also referred to as a descending dissection. (<u>Id</u>.) Thus, in
general, the distinction between a "type A" and a "type B" aortic dissection merely refers to the
part of the aorta where the dissection occurs.

    [3] The Court notes that records from Plaintiff's treating physician at Yale-New Haven
Medical Center (Dr. Michael Dewar, M.D.) stated that Plaintiff's postoperative stroke took place
two days post-operation whereas records from consulting physician Dr. Scott Kasner, M.D. noted
that Plaintiff's stroke occurred one day post-operation.  For the purposes of this litigation, the
discrepancy in records is unimportant.

to Drs. Scott Kasner, M.D. (Plaintiff's consulting physician), Michael Dewar, M.D., and Edward D. Viner, MD (a second Plaintiff's consulting physician), Plaintiff's stroke was, in the words of Dr. Viner, "most likely caused by platelet embolization secondary to the prostatic valve that was put in place" during Plaintiff's October 25, 2002 surgery. (<u>Id</u>. at 260.)  According to Dr. Viner, platelet embolization "is a well known complication of aortic valve surgery." (<u>Id</u>.)  The stroke left Plaintiff with a number of medical problems including post-stroke pain syndrome and neurologic problems such as significant cognitive, sensory and motor deficits. (<u>Id</u>. at 347, 531-32.)  According to both Drs. Viner and Kasner, these deficits left Plaintiff "clearly disabled" or limited his ability to return to work.[4] (<u>Id</u>.)

**D.   Plaintiff's Medical History**

**1.   Plaintiff's Treating Physicians and Consultants**

Both prior to October 2002 and after the events of October, 2002, Plaintiff was seen and treated by a number of physicians. Below, the Court summarizes Plaintiff's medical treatment prior to the events of October, 2002 and the reports and conclusions of doctors that have either treated Plaintiff or served as a consulting physician for Plaintiff after Plaintiff's type A aortic dissection:

---

[4] On October 25, 2003, Plaintiff was awarded Social Security Disability Benefits accruing from April, 2003.  Plaintiff was deemed disabled by the Social Security Administration as of October 24, 2002.  (<u>Id</u>. at 319-22.)

Dr. Joseph Bavaria, M.D.[5]:  Because Dr. Bavaria has been
Plaintiff's treating physician since May, 2002, he can inform the
Court regarding Plaintiff's medical history prior to the events
of October, 2002. (Id. at 388.)  According to correspondence from
Dr. Bavaria to Defendant, before Plaintiff began his employment
with BusinessEdge, Plaintiff was diagnosed with a type B aortic
dissection.  (Id.)  According to Dr. Bavaria, Plaintiff's ailment
was being managed through a course of "aggressive medical
management for hypertension control."  (Id.)

Dr. Michael L. Dewar, M.D.[6]: Dr. Dewar performed the surgery
to repair Plaintiff's type A aortic dissection on October 25,
2002.  In a letter to Defendant, Dr. Dewar stated that Plaintiff
(1) was not diagnosed with Marfan Syndrome[7] and (2) the
pathological findings at the time of surgery showed extensive
myxoid degeneration of Plaintiff's ascending aorta and valve.
(Id. at 59.)  Dr. Dewar's letter further stated that Plaintiff
"did not have a pre-existing condition that would have

---

[5]Dr. Bavaria, a cardiac and thoracic surgeon, currently serves as the Vice Chief,
Associated Professor of Surgery and Director of Thoracic Aortic Surgery at the University of
Pennsylvania.  Dr. Bavaria is a surgeon who has treated Plaintiff since May of 2000. (Rec. at
406.)

[6] Dr. Dewar served as Assistant Clinical Professor at Yale University.

[7]  Marfan Syndrome is a connective tissue multisystemic
disorder characterized by skeletal changes (arachnodactyly, long
limbs, joint laxity, pectus), cardiovascular defects (aortic
aneurysm which may dissect, mitral valve prolapse) and ectopia
lentis..." caused by a genetic mutation.

predisposed him to his dissection of his ascending aorta [type A dissection] nor the neurologic sequelae that followed from the operation." (Id.)  In a February 26, 2004 letter to Defendant, Dr. Dewar stated that Plaintiff's:

> [T]ype A dissection was not caused by his type B dissection. In the operating room, the entry point of the dissection was nowhere near the type B dissection. [Rather the dissection being repaired] was in the ascending aorta, which is probably 6 or 7 centimeters away from where the type B dissection was.  There was no relationship between the two [conditions]....

(Id. at 59.)

Dr. Edward Viner, M.D.[8]: Dr. Viner is Plaintiff's treating physician for internal medicine matters.  (Id. at 393.)  In a letter to Defendant dated April 15, 2003, Dr. Viner stated that Plaintiff's disability was caused by a "perioperative cerebrovascular accident" which effected Plaintiff's cognitive abilities." (Id.)  Following up his 2003 correspondence, Dr. Viner provided Defendant with a three-page report on May 5, 2004 stating (1) at the time of the type B aortic dissection on May 19, 2000, there was no evidence that a type A aortic dissection existed or was developing and (2) that "there is no way that anti-hypertensive medication could cause or complicate an aortic dissection." (Id. at 124-127.)  Furthermore, Dr. Viner indicated

---

[8] Dr. Viner is Professor of Medicine, University of Medicine and Dentistry New Jersey Robert Wood Johnson Medical School in Camden, New Jersey and Chief of the Department of Medicine at the Cooper Health System.

that, in his opinion, type B dissections do not cause type A dissections.  (See id.)

Dr. Scott Kasner M.D.[9]: Dr. Kasner is Plaintiff's treating neurologist.  In an October 8, 2003 letter to Defendant, Dr. Kasner stated that, although Plaintiff had a type B aortic dissection prior to his enrollment in the Plan, his condition "was not related to the type A aortic dissection that occurred in October of 2002."  (Id. at 392.)  Thus, Dr. Kasner stated essentially that Plaintiff's previous condition (type B aortic dissection) was a separate condition from the type A aortic dissection that occurred in October, 2002. In his letter, Dr. Kasner stated further that "the stroke of October 2002 may in fact have been related to replacement of his aortic valve, which was not known to be abnormal at any time prior to October 2002." (Id.)  In summary, Dr. Kasner stated that "there is absolutely no evidence that [Plaintiff] had any pre-existing condition that would have predisposed him toward the stroke and his profound neurological deficits."  (Id.)

Dr. Emile Mohler, III, M.D.[10]: Dr. Mohler is Plaintiff's treating physician regarding his cardiovascular health.  (Id. at 158.)  In a letter to Defendant dated October 10, 2003, Dr.

[9] Dr. Kasner is the Director, Comprehensive Stroke Center, Department of Neurology, University of Pennsylvania.

[10] Dr. Mohler is Director Vascular Medicine and the University of Pennsylvania Medical Center, University of Pennsylvania School of Medicine.

Mohler stated that Plaintiff "has no history of Marfan disease or an obvious etiology for the [type A] aortic dissection" Plaintiff suffered in late October 2002. (Id.)  In a June 9, 2004 letter, responding to the question posed by a representative of Defendant whether type A dissection is caused by, contributed to or results from hypertension, Dr. Mohler stated that "type A dissection according to the medial literature is associated with hypertension."  (Id. at 65.)  In response to the question of whether Plaintiff was cautioned in the development of a type B dissection extending further or the formation of a type A dissection, Dr. Mohler answered "yes, Mr. Meyers was educated on aortic dissection" and stated that "precautions were taken to try and prevent type A dissection as [Plaintiff's] blood pressure was maintained at a low level with antihypertensive medication."[11] (Id.)  Dr. Mohler also stated that type A and type B dissections are not specifically inter-related, but that it was "unclear" whether Plaintiff "had the same problem both in the ascending and descending portions of the aorta."  (Id.)

**2.   Defendant's Medical Consultants**

---

[11] Specifically, in describing his pre-disability discussions with Plaintiff regarding the possibility of a type A dissection, Dr. Mohler stated that Plaintiff:

> was educated on aortic dissection and was told that dissection may involve the entire aorta.  Precautions were taken to try and prevent type A dissection as his blood pressure was maintained at a low level with antihypertension medication.

(Id. at 65.)

As part of the claims process, Defendant had Plaintiff's medical records reviewed by two outside physicians, Dr. Michael Rosenberg, M.D. and Dr. Sara Finnegan, M.D.  These reports are summarized below:

Dr. Michael Rosenberg, M.D.: Dr. Rosenberg, who is Board Certified in Internal Medicine and Cardiology, works for Elite Physicians, Ltd., an independent medical review company retained on behalf of Defendant to review Plaintiff's claim.  (Id. at 352.) As summarized in a January 2, 2004, Dr. Rosenberg reviewed Plaintiff's medical records.  His report specifically addressed the question of whether Plaintiff's aortic dissection of October 2002 was caused by, contributed to by, or resulted from Plaintiff's previous aortic dissection to which Dr. Rosenberg answered that "it seems most likely that the Type A and Type B dissections are intimately related...." (Id. at 352-55.)

In addition, Dr. Rosenberg also addressed the question of whether medical records reflect any medical care, treatment, consultation, diagnosis or diagnostic tests or the medications that Plaintiff took caused, contributed to or resulted in the disability commencing in October, 2002.  (Id. at 354.)  In response, Dr. Rosenberg stated that the treatment of type B aortic dissection is that of blood pressure control and that Plaintiff "had a pre-existing condition - the type B aortic dissection beginning at the level of the left subclavian artery,

11

and elevated blood pressures, both of which would substantively
be associated with the type A dissection subsequently
experienced." (<u>Id</u>. at 354-55.)  Rosenberg also stated that "the
myxoid degeneration of the arterial media, likely associated with
the type B dissection, was clearly associated with the type A
dissection...." (<u>Id</u>. at 355.)

   <u>Dr. Sarah G. Finnegan, M.D.</u>:  Dr. Finnegan, who is Board
Certified in Neurology and Psychiatry, working for Elite
Physicians, Ltd., likewise conducted a review of Plaintiff's
medical records and reported the results to Defendant on January
24, 2004. (<u>Id</u>. at 281-84.)  In her report, Dr. Finnegan
specifically addressed the question of whether Plaintiff's stroke
was caused by, contributed to by, or resulted from the aortic
dissection/valve replacement surgery in December of 2002. (<u>Id</u>.
at 283.)  Dr. Finnegan concluded that "embolic strokes are a
known complication of vascular surgical techniques and would one
[sic] have to say that the stroke was related to the surgical
correction of the aneurysm." (<u>Id</u>.)  In addition, Dr. Finnegan
also addressed the question of whether the stroke was cause by,
contributed to by or resulted from any condition for which the
claimant received medical care, treatment, consultation,
diagnostic tests, took any drugs or medicines from May, 19, 2002
through August 19, 2002. (<u>Id</u>.)  In response to the question, Dr.
Finnegan stated that "[t]here is no indication that the aneurysm

would lead to an ascending acute dissection and there is no
evidence that [Plaintiff] required intervention prior to that."
(Id.)

   E.   **The Events After October 2002**

        1.   **Defendant's Initial Denial of Plaintiff's Claim**

   From October 2002 until April 30, 2003, Plaintiff received
short-term disability benefits from Defendant.  On December 5,
2002, Plaintiff requested a leave of absence for medical purposes
with the leave commencing on October 24, 2002.  (Rec. 173-74.)
Plaintiff's employment was terminated on June 12, 2003. (Rec.
734.)  On May 21, 2003, Defendant denied Plaintiff's claim for
long term disability benefits under the Plan. (Id.)  In this
letter, a long term disability consultant for Defendant, Cynthia
Johnson, first discussed information provided to Defendant by
Plaintiff's physicians that Plaintiff was treated "for symptoms
associated with Marfan Syndrome [and] with associated aortic
dissection and hypertension."  (Id. at 386.) The letter stated
further that:

        The medical evidence indicates that the ultimate
        cerebral vascular accident of October 25, 2002 which
        rendered you totally disabled was directly related to a
        pre-existing medical condition for which you received
        medication and consultation for in regards to Marfan
        Syndrome and associated aortic dissection.

(Id. at 386-87.)  The denial letter continued, stated that "[i]n
view of the information submitted, it appears that you were not
treatment free as defined...[and] in view of these findings

13

[Defendant] cannot admit liability."  (<u>Id</u>.) On July 8, 2003, Plaintiff appealed the denial arguing that; (a) he had never been diagnosed with Marfan Syndrome and (b) that the aortic dissection he suffered in October, 2002 was separate from the aortic dissection he was being treated for prior to the beginning of his employment at BusinessEdge.  (<u>Id</u>. 334.)

### 2.   <u>Defendant's Second Denial of Plaintiff's Claim</u>

Plaintiff appealed the initial rejection on March 16, 2004 and included additional medical records and narrative reports from Plaintiff's treating physicians.  (<u>Id</u>. at 240-41.)  In response to the additional medical reports, Defendant again consulted Dr. Rosenberg who, in a supplemental report dated March 29, 2004, stated that "aortic dissection, whether type A or type B...are largely the same disease process with different events." (<u>Id</u>. at 219.)  Defendant also requested and received additional information from Plaintiff's treating and consulting physicians. (<u>Id</u>. at 65-66, 70-71, 116-17, 124-26.)

Defendant issued a final determination on July 29, 2004, again denying Plaintiff's claim.  (<u>Id</u>. at 57-64.)  In the letter, Defendant explained the basis for its determination.  (<u>Id</u>.)  With respect to whether coverage was excluded because of a pre-existing condition, Defendant stated that it "look[ed] at the period from May 19, 2002 through August 18, 2002 (the treatment-free period) to determine if [Plaintiff] had received treatment."

14

(Id. at 57.)  Defendant stated that it found that Plaintiff had been under medical care for a type B aortic dissection and cites a June 11, 2002 report where Dr. Bavaria states that Plaintiff "has a past medical history significant for a family history of aortic dissection as well as hypertension...."  (Id. at 58.) Defendant's report also stated that pharmacy records show Plaintiff purchased prescription medication to treat high blood pressure on June 9, 2002, July 8, 2002, August 7, 2002 and August 15, 2002.  (See id.)

Defendant's final determination also noted that, at times, Plaintiff's treating physicians' testimony "appeared contradictory" citing, in particular, instances where Dr. Dewar's accounts included contradictory statements and that Defendant received no response in its attempt to obtain clarification regarding these contradictions. (Id. at 59-60.)  Defendant also appear to place great weight on a June 9, 2004 letter from Dr. Mohler which stated that (1) the physicians who were treating Plaintiff for his type B dissection were clearly concerned with progression of this dissection into the ascending aorta and (2) precautions, including prescribing medication to control Plaintiff's hypertension, were used in an effort to prevent progression of the aortic dissection in October of 2002. (See id. at 62.)  Defendant also appear to place weight on the report of

Defendant's reviewing physician, Dr. Rosenberg.  Specifically,

Defendant cites Dr. Rosenberg's finding that:

> [T]he type B aortic dissection...and elevated blood
> pressures, both of which would substantively be
> associated with type A dissection subsequently
> experienced...[and] in the strictest sense...the type A
> dissection and aortic valve replacement do relate
> directly to the type B dissection suffered previously.

(Id. at 63.)

Ultimately, Defendant concluded that it would not admit

liability on Plaintiff's claim. (Id.)  Instead, Defendant

concluded:

> The type A dissection falls under the pre-existing
> condition definition of this policy.  Mr. Meyers was
> taking anti-hypertensive medication in an effort, as
> reported by Drs. Bavaria and Mohler, to prevent the
> progression of his type B dissection into the ascending
> aorta, which is classified as a type A dissection,
> during the treatment free period of this coverage.
> Such progression occurred on October 24, 2002,
> necessitating surgical correction and resulting in
> cessation of Mr. Meyer's employment.  Therefore, no
> coverage was in effect at the time he experienced a
> perioperative stroke on October 26, 2002.

(Id. at 63-64.)

### F.   **Procedural History**

After Defendant made its final determination, Plaintiff

filed a Complaint with this Court on November 8, 2004 [Docket

Item No. 1].  On July 27, 2005, Defendant and Plaintiff filed

cross-motions for summary judgment [Docket Item Nos. 14 and 16].

Defendant filed its opposition to Plaintiff's motion on August

19, 2005 [Docket Item No. 18, respectively].  Plaintiff filed its

opposition to Defendant's motion on September 6, 2005 [Docket
Item No. 19] to which Defendant timely replied on September 8,
2005 [Docket Item No. 20.]

## II.  <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Defendants and Plaintiffs have cross-moved for summary
judgment pursuant to Rules 56(b) and 56(a), Fed. R. Civ. P.,
respectively.  A court may grant summary judgment when the
materials of record "show that there is no genuine issue as to
any material fact and that the moving party is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Lang v.</u>
<u>New York Life Ins. Co.</u>, 721 F.2d 118, 119 (3d Cir. 1983).  A
dispute is "genuine" if "the evidence is such that a reasonable
jury could return a verdict for the non-moving party."  <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is
"material" only if it might affect the outcome of the suit under
the applicable rule of law.  <u>Id</u>.  Disputes over irrelevant or
unnecessary facts will not preclude a grant of summary judgment.
<u>Id</u>.[12]

---

[12] The summary judgment standard does not change when, as
here, the parties have filed cross-motions for summary judgment.
<u>See</u> <u>Appelmans v. City of Phila.</u>, 826 F.2d 214, 216 (3d Cir.
1987).  Cross-motions for summary judgment:
17

> are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is
> necessarily justified or that the losing party waives
> judicial consideration and determination whether

III.  **DISCUSSION**

    **A.   Standard of Review**

    ERISA does not set out the standard of review for actions brought under Section 1132(a)(1)(B) by an employee alleging that he has been denied benefits he is entitled to under a covered plan.  See 29 U.S.C. § 1132(a)(1)(B).  However, in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 108-11 (1989), the Supreme Court held that, when a benefits plan affords the administrator discretionary authority to construe the plan or determine eligibility for benefits, the administrator's interpretation of the plan will be reviewed under an arbitrary and capricious standard.  This standard of review applies whether the plan administrator's determination was based on (i) the interpretation of the plan or (ii) factual determinations (so long as the plan authorizes the administrator to make such factual determinations).  See Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997).

---

    genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

A modified arbitrary and capricious standard is proper, however, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." Firestone Tire & Rubber Co., 489 U.S. at 115 (a plan administrator's conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion") (internal quotations omitted); see Kosiba v. Merck & Co., 384 F.3d 58, 67 (3d Cir. 2004).  When reviewing an ERSIA plan fiduciary's discretionary determination regarding benefits, a court must apply a so-called "heightened" arbitrary and capricious standard of review.  See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000).  This heightened standard of review uses a "sliding scale approach" for determining what modifications (if any) a court must make to the level of scrutiny applied to a plan administrator's decision so that "the degree of scrutiny [intensifies] to match the degree of conflict."  Id. at 392.  When applying the standard, a court is directed to consider "the nature and degree of apparent conflicts."  Id. at 393.  The "heightened" arbitrary and capricious standard is applicable in situations, like here, when the court is "reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds."  Id. at 390.

**1.   The Court will Apply a Heightened Arbitrary and Capricious Standard of Review**

Here, the Plan grants Defendant, as the claims fiduciary, discretion to interpret the terms of the Plan and the power to determine eligibility.[13]  Thus, an arbitrary and capricious standard is warranted under the holdings of Firestone and Mitchell.  Our analysis does not end there, however.  Because Defendant plays the dual role of the Plan's claims administrator and payor of all benefits under the Plan, it is clear that a conflict of interest exists here.  See Pinto 214 F.3d at 378 ("[W]hen an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of arbitrary and capricious standard of review.")  Such a conflict of interest warrants application of a "heightened arbitrary and capricious" standard of review, requiring this Court to review more closely the Plan administrator's decision to deny benefits and consider the nature and degree of apparent conflicts with a view to shaping the arbitrary and capricious

---

[13]  Part 13 of the Plan states:

GE Group Life Assurance Company as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the [Plan's] Policy.  The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits.  All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and capricious manner..[and] the Claims Fiduciary shall be on [sic] the sole judge of the standard of proof required in any claims [sic] for benefits and/or in any question of eligibility for benefits.

(Rec. at 27.)

review of the benefits determinations.[14]  Here, the Defendant
would have experienced a direct financial loss if it, as the
Plan's claims administrator, had determined that Plaintiff was
eligible for long term disability benefits under the Plan.  Thus,
in making benefits eligibility determinations, Defendant is
operating under a clear structural conflict of interest that is
the exact type described by the Third Circuit in Pinto.  See
Pinto, 214 F.3d at 390 ("[W]e believe that a higher standard of
review is required when reviewing benefits denials of insurance
companies paying ERISA benefits out of their own funds.")

Finding a direct structural financial conflict of interest,
this Court, then, will apply a "heightened arbitrary and
capricious" standard or review.  Under the arbitrary and
capricious standard, the Court may overturn Defendant's decision
regarding Plaintiff's eligibility "only if it is without reason,
unsupported by substantial evidence or erroneous as a matter of
law."  Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d
Cir. 1993)(internal quotations omitted).  However, under the
"heightened" standard, this Court must review the Plan
administrator's eligibility decision by looking not only at the
results - to determine whether it is supported by reason - but at

---

[14]  In its brief in support of it motion for summary judgment, Defendant, citing Pinto,
concedes that "[t]he modified arbitrary and capricious standard is appropriate in this case" and
requires that this Court "appl[y] less deference if the [C]ourt finds evidence that the claim review
fiduciary's decision was influenced by a conflict." (Def.'s Mot. for Summary Judgment at 8.)

"the process by which these results are achieved."  <u>Pinto</u>, 214
F.3d at 393.  Furthermore, "[a] court should intensify the level
of scrutiny it applies to an insurer's decision if there are any
procedural irregularities in the decision-making process."  <u>Id</u>.
at 394.

### 2.   Plaintiff's Argument that the Court Should Apply a <u>De Novo</u> Standard of Review is Without Merit

In its brief in support of its cross-motion for summary
judgment, Plaintiff argues that this Court must review
Plaintiff's claim under a <u>de novo</u> standard of review.  (Pl.'s Br.
at 14-18.)  Plaintiff argues that, because Defendant did not
render a decision on Plaintiff's eligibility within the time
limits established by ERISA and the Department of Labor's
regulations, Plaintiff's claim was "deemed denied."  (<u>Id</u>. at 15.)
Plaintiff relies on <u>Nichols v. The Prudential Ins. Co.</u>, 406 F.3d
98, 109 (2d Cir. 2005), where the Second Circuit held that, when
a plaintiff's claims are "deemed denied," a district court must
review the claims administrator's denial under a <u>de novo</u>
standard.

The Court disagrees.  First, Plaintiff failed to cite the
only precedential decision in this Circuit regarding the
application of a <u>de novo</u> standard of review when a claim was
"deemed denied."  <u>See</u> <u>Gritzer v. CBS, Inc.</u>, 275 F.3d 291 (3d Cir.
2002).  In <u>Gritzer</u>, plaintiffs were a group of plant employees
who filed a claim letter with their employer's claims

administrator seeking pension benefits.  See id. at 294.  The
pension plan was an ERISA plan that gave the employer, as plan
administrator, "essentially unfettered discretion to interpret
the Plan and to determine entitlement to its various benefits."
Id. at 295.  The plan administrator failed to respond to the
plaintiffs' claim within 90 days and thus, the claim was "deemed
denied."  See id.  Based on these facts, the Third Circuit held
that the district court should have applied a de novo standard of
review, reasoning that, by not responding, the plan administrator
did not exercise any discretion in denying the benefit.  See id.
at 294.  As such, there was nothing for the district court to
review under the arbitrary and capricious standard.  See id.
"Had discretion in fact been exercised in the course of denying
benefits," the court would have applied an arbitrary and
capricious standard, but since discretion was not exercised, a de
novo standard of review was appropriate.  See id.[15]

    The present case is distinguishable for both Gritzer and
Nichols because, unlike in Gritzer and Nichols, Plaintiff's claim
for long term disability was not "deemed denied" under either (1)

_____

[15]   The Courts of Appeal have split on the question of whether a claim that is "deemed
denied" is always entitled to de novo review, a majority of circuits have held that, absent
substantial compliance with the deadlines, de novo review applies on the ground that inaction is
not a valid exercise of expertise upon which to defer.  See Nichols, 406 F.3d at 109, see e.g.,
Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 349
F.3d 1098, 1106-07 (9th Cir. 2003); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 632-33 (10th
Cir. 2003); Gritzer, 275 F.3d at 295.

the applicable ERISA regulations or (2) the terms of the Plan. Plaintiff first argues that the failure of a plan administrator to conduct his review and make a determination within the operational deadlines enumerated in 29 C.F.R. § 2560.503-1(h)(1)(i) entitles a claimant to de novo consideration by the district court.  (Pl.'s Br. at 15-17 citing Nichols, 406 F.3d at 102.)  Under Section 2560.503-1(h) of the Department of Labor's regulations, a plan administrator is required to issue a decision reviewing an initial denial of benefits within sixty (60) days of the request for such review.[16]  See 29 C.F.R. § 2560.503-1(h)(1)(i).  Prior to 2002, if no decision was rendered by the deadline, the claim for benefits was "deemed denied" upon review. See id. at § 2560.503-1(h)(4).

In 2000, Section 2560 was amended and the language stating that a claims is "deemed denied" upon review if a claimant did not receive written notice within the relevant time period was removed.  See Pension and Welfare Benefits Administration, 65 Fed. Reg. 70246, 70265, 70268-69 (Nov. 21, 2000); see also Jebian, 349 F.3d at 1103, n.5; Ott v. Litton Indust. Inc., 2005 U.S. Dist. LEXIS 14997 at *17-18 (M.D. Pa. 2005).  Specifically excised from the new regulations - which are applicable to all claims filed after January 1, 2002 - was the provision that

---

[16]  A plan administrator may take up to 120 days if special circumstances exists, however. See id. at § 2560.503-1(h)(4).

transgressions of time limitations will result in claims being "deemed denied."  See 29 C.F.R. § 2560.503-1(h)(2002); see also Jebian, 349 F.3d at 1103, n.5; Ott, 2005 U.S. Dist. LEXIS at *18. Nichols, decided by the Second Circuit under the prior regulations, is not pertinent on this point.  Thus, Plaintiff's argument that a de novo standard of review is appropriate is unpersuasive; under current law, such claims are not deemed denied by the mere passage of the 60-day period.

**B.   Pre-existing Condition**

In its motion for summary judgment, Plaintiff argues that Defendant erred in denying Plaintiff long term disability benefits based upon an "alleged" pre-existing condition. (Pl.'s Br. at 19.)  Specifically, Plaintiff argues that he was not suffering from any symptoms that were consistent with type A aortic dissection during the treatment free period nor did he have any manifestations "of any magnitude" that would in any way lead one to conclude that he was going to require urgent surgery for type A aortic dissection.  (Id. at 27.)

Defendant argues that the Plan unambiguously excludes benefits for pre-existing conditions.  (Rec. at 18.)  The exclusion applies, according to Defendant, because Plaintiff consulted with a physician regarding type A aortic dissection, and took medication to prevent it during the treatment free period.  (Def.'s Br. at 9.)  Because a type A dissection was a

25

pre-existing condition, Defendant argues, Plaintiff is not
entitled to long term disability benefits after he suffered a
type A dissection that rendered him disabled.  (Def.'s Br. at 9-
10.)  In the alternative, Defendant argues that it is not liable
for long term disability benefits based on Plaintiff's claims
that he was permanently disabled due to a stroke he suffered one
day after the surgery for the aortic dissection because (a) the
stroke would be excluded from the policy as being "contributed to
by" or "result from" a pre-existing condition or (b) at the time
of the stroke, Plaintiff was on a medical leave of absence and
therefore Plaintiff was no longer covered by the Plan.  (Id. at
12-13.)  Thus, under the Plan, if Plaintiff was treated,
consulted a doctor about or took prescribed drugs or medicines
during these three months for the same sickness or injury which
he claims caused his disability, the Plan's pre-existing
condition exclusion would allow Defendant to properly deny
Plaintiff's claim.

### 1.    The Third Circuit Law Regarding Coverage for Pre-existing Conditions

The Third Circuit recently addressed the issue of whether an
insurance company's determination that a claimant's illness was a
pre-existing condition and therefore should be excluded from
coverage was arbitrary and capricious.  See Lawson ex Lawson v.
Fortis Ins. Co., 301 F.3d 159 (3d Cir. 2002); see also McLeod v.
Hartford Life & Acc. Ins. Co., 372 F.3d 618 (3d Cir. 2004).  In

Lawson, the claimant presented in the emergency room with a cough, fever, elevated pulse rate and swollen eye during a period analogous to the treatment free period, was diagnosed with an upper respiratory tract infection, and was prescribed antibiotic and anti-allergy medication.  Lawson, 301 F.3d at 161.  After the treatment free period ended, the claimant's symptoms persisted and claimant was eventually diagnosed with leukemia.  See id. Claimant filed a claim for payment of medical bills but the defendant insurance company denied the claim, stating that the policy expressly excludes coverage or pre-existing conditions and that claimant's illness was a pre-existing condition.[17]  See id.

The central issue in Lawson was "whether receiving treatment for the symptoms of an unsuspected or misdiagnosed condition prior to the effective date of coverage makes the condition a pre-existing one under the terms of the insurance policy."  Id. at 162.  Reviewing the plan administrator's determination under an arbitrary and capricious standard of review, the Third Circuit held that the claimant "did not receive advice or treatment for leukemia" during the treatment free period but instead was treated for a respiratory tract infection and therefore, her

---

[17]  The insurance policy in Lawson defined a pre-existing condition as a "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician" within a period analogous to the treatment free period. Id. at 161.

sickness (leukemia) was not a pre-existing condition.  <u>Id</u>. at

165.  The court stated:

> [W]hen the patient exhibits only non-specific symptoms
> and neither the patient nor the physician has a
> particular concern in mind, or when the patient turns
> out not to have a suspected disease, it is awkward at
> best to suggest that the patient sought or received
> treatment for the disease because there is no
> connection between the treatment or advice received and
> the sickness.  Here, there is no evidence that the
> possibility that [claimant's] condition was actually
> leukemia ever entered the minds of [claimant] or [her
> doctor.]

<u>Id</u>. at 166.  The court then concluded that the insurance

company's determination to deny coverage was arbitrary and

capricious.[18]  <u>See</u> <u>id</u>.

The court addressed a similar issue two years later in

<u>McLeod</u>.  <u>See</u> 372 F.3d at 620.  In <u>McLeod</u>, the claimant, who was

being treated for a variety of ailments, presented to her doctor

with the symptom of numbness in her arm during a period analogous

to the treatment free period.  <u>See</u> <u>id</u>. at 621.  The diagnosis of

---

[18] The court continued, stating:

Although we base our decision on the language of the policy, we note that considering treatment for symptoms or a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period.  "To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of pre-existing conditions as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial." <u>Ermenc v. American Family Mut. Ins. Co.</u>, 585 N.W.2d 679, 685 (Ct. App. Wisc. 1998.)

<u>Id</u>. at 166.

multiple sclerosis ("MS") was not made until after the treatment
free period ended when the claimant's treating physician
determined that the previously diagnosed symptoms were symptoms
of MS.  See id. at 621-22.

The issue before the McLeod court was whether the insurance
company could "read back" a pre-existing condition for purposes
of excluding coverage when the condition itself was not diagnosed
in the treatment free period, "especially in a situation...where
other diagnoses were made as to the very symptoms that are now
being attributed to the (alleged) pre-existing condition."  Id.
at 625.  The court ultimately held that claimant:

> [D]id not receive treatment 'for' such a pre-existing
> condition [during the treatment free period] because
> neither she nor her physicians either knew or suspected
> that the symptoms she was experiencing were in any way
> connected with MS.

Id. at 620.  Applying the heightened arbitrary and capricious
standard of review formulated in Pinto, the Court held that the
decision to deny claimant's long term disability benefits was
arbitrary and capricious.[19]  See id.  While a correct diagnosis
need not have been made prior to coverage, the condition must, at
least, have been suspected or considered by the doctor then.  See
id. at 627-28.

---

[19] Applying the rule in McLeod, a district court recently held that an insurer, then,
"cannot use hindsight to conclude that the insured had received medical care for the
manifestations or symptoms of a specific condition that was not then diagnosed or was
misdiagnosed or was not suspected."  Wright v. Matrix Absence Mgmt., Inc., 2005 WL 475173,
*10 (E.D. Pa. March 1, 2005)(citing McLeod, 372 F.3d at 628.)

2. **Whether Plaintiff's Condition Should be Considered a Pre-existing Condition**

Here, the Court holds that, under the heightened standard of review, Defendant's determination that Plaintiff's type A dissection (which resulted to the stroke that caused Plaintiff's disability) was a pre-existing condition was not arbitrary and capricious. First, Defendant's conclusion that the condition that led to Plaintiff's stroke was properly considered a "pre-existing condition" under the definition of pre-existing condition in the Plan was not unreasonable. Plaintiff suffered a type A aortic dissection that required surgery and an aortic valve replacement. Plaintiff then suffered a postoperative embolic stroke - an event which Drs. Kasner, Dewar, Viner and Finnegan state is a well-known complication from aortic valve replacement surgery - that left Plaintiff totally disabled. Defendant claims the type A aortic dissection was a pre-existing condition. As such, the disability was caused by, contributed to by or resulted from the type A dissection.

The parties do not argue that the surgery necessary to repair the type A dissection led to the embolic stroke that caused Plaintiff's disability. Rather, the dispute centers on whether the type A dissection was a pre-existing condition. Plaintiff presents three doctors (Drs. Kasner, Viner and Dewar) to say, in essence, that Plaintiff's type B dissection did not cause the type A dissection and therefore, Plaintiff had no pre-

existing condition.  Defendant counters with Drs. Rosenberg and Finnegan who state that "[i]n the strictest sense...the type A dissection and aortic valve replacement do relate directly to the type B dissection suffered previously" and "[t]hese are, undoubtedly, the same disease process."  (Id. at 63.) Defendant's inquiry also focuses on a June 9, 2004 letter of Plaintiff's treating physician Dr. Mohler in which Dr. Mohler states that Plaintiff was:

> [E]ducated on aortic dissection and was told that dissection may involve the entire aorta [and that] [p]recautions were taken to try and prevent type A dissection as his blood pressure was maintained at a low level with antihypertensive medication.

(Id. at 65.)  From this, Defendant concluded that, as to the type A dissection, Plaintiff at minimum, received medical consultation (Plaintiff was "educated on aortic dissection and was told that dissection may involve the entire aorta"), received medical treatment regarding risks of type A dissection (Mohler states he took precautions "to try and prevent type A dissection") and that, given Plaintiff's pharmacy records showing that Plaintiff bought antihypertensive medication during the treatment free period, Plaintiff took medications related to the risk of a type A dissection (Plaintiff's "blood pressure was maintained at a low level with antihypertensive medication.") Id.  This Court, then, finds that based on Dr. Mohler's letter describing his treatment of Plaintiff prior to the October, 2002 events and the statements

made by Defendant's consulting physicians, Defendant's conclusion
that type A dissection was a pre-existing condition and its
ultimate determination to deny Plaintiff's claim was not
arbitrary and capricious.

Second, contrary to Plaintiff's arguments, the facts of this
case are distinguishable from those of <u>McLeod</u> and <u>Lawson</u>.  Unlike
the claimants in <u>McLeod</u> and <u>Lawson</u>, Plaintiff was not suffering
from or being treated for symptoms of an undiagnosed or
misdiagnosed illness.  Rather, according Dr. Mohler:

- Plaintiff was warned that his type B aortic dissection
  could lead to a dissection of the entire aorta;

- Plaintiff was treated medically to "prevent type A
  dissection as his blood pressure was maintained at a
  low level with antihypertension medication;" and

- Pharmacy records show that Plaintiff purchased
  antihypertension medication during the treatment free
  period.

(<u>Id</u>. at 65, 503.)  Thus, the Defendant is not arguing that
Plaintiff's prior symptoms or misdiagnosed ailments are the basis
for Defendant's position that coverage is excluded due to a pre-
existing condition but that Plaintiff's treating physician was
concerned about, and Plaintiff was expressly advised about the
risk of a type A dissection and Plaintiff was taking medication
intended to reduce this risk.

Third, Defendant's determination that the type A aortic
dissection is a manifestation of the same aortic disease process
which had led to the type B dissection of the same vessel is not

medically unreasonable.  The same vessel had dissected and the risk was patent that it could do so again.  This lies beyond a hypothetical risk (such as the enhanced risk of heart attack in an obese person with high blood pressure), and crosses into the realm of a pre-existing condition, that is, the type A and type B aortic dissection "are largely the same disease process with different events," as stated by Dr. Rosenberg.  (Id. at 63.)

Moreover, in holding that Defendant's determination was not arbitrary and capricious (under the heightened standard established in Pinto), this Court is not allowing Defendant to engage in the "backward-looking reinterpretation" the Third Circuit warned about in Lawson.  Rather than using the treatment for symptoms of a not-yet-diagnosed condition as the basis for a pre-existing condition rejection, Defendant is relying on information from Plaintiff's own treating physician stating that Plaintiff was warned about the risks of, and preventive action taken to prevent, a type A dissection.[20]

## IV.  CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment will be granted and Plaintiff's cross-motion will be denied.

---

[20] Because the Court holds that Defendant's determination that coverage was excluded due to a pre-existing condition was not arbitrary and capricious, the Court need not address Defendant's alternative argument that Plaintiff, having taken a medical leave of absence effective October 24, 2002, was not eligible for benefits under the Plan on the date he suffered his postoperative stroke (October 26, 2002).

The accompanying Order is entered.


**March 10, 2006**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge